

Craya C. Caron
1125 Jackrabbit Trail
Twentynine Palms, California 92277
(760) 362-4380, Fax: (760) 666-1377
caroncra@earthlink.net

LODGED
CLERK, U.S. DISTRICT COURT
JUN 21 2018
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION BY DEPUTY

FILED
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
RIVERSIDE
2018 JUN 22 AM 11:40
BY

**UNITED STATES DISTRICT COURT,**
**CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION**

Craya C. Caron,

*Plaintiff,*

vs.

OMSNIC,
Rainbow Specialty & Health Products Inc.
DOES 1-10 inclusive,

*Defendants.*

Case No.: ED CV18-01339 GW (JEMx)

**COMPLAINT FOR**
**(1) NEGLIGENCE – NEGLIGENT INSURANCE POLICY UNDERWRITING, NEGLIGENT INSURANCE CLAIM HANDLING,**
**(2) PRODUCT LIABILITY BASED ON NEGLIGENCE**

**<u>REQUEST FOR JURY TRIAL</u>**

Plaintiff, Craya C. Caron herein alleges;

## JURISDICTION

1. The Federal District Court has jurisdiction over this civil matter pursuant to 28 U.S.C. §1332 - diversity jurisdiction - whereby Plaintiff Craya C. Caron is a resident of California, Defendant OMSNIC is a resident of Illinois and Defendant Rainbow Specialty & Health Products Inc. is a resident of the Providence of Ontario in the Country of Canada . Thus complete diversity of the parties exists.

## PARTIES

2. Plaintiff, Craya C. Caron is a private citizen, permanent resident of San Bernardino County, living at 1125 Jackrabbit Trail, Twentynine Palms, California 92277.

3. Defendant, Oral Maxillofacial Surgeons National Insurance Company

(hereinafter "OMSNIC") is a national dental malpractice insurance carrier specializing in insuring oral surgeons throughout the United State. OMSNIC is an Illinois Corporation headquartered RRG 6133 North River Road, Suite 650, Rosemont, IL 60018.

4. Defendant, Rainbow Specialty & Health Products Inc. (hereinafter "Rainbow") is the manufacturer of Dressol-X, a combination topical pharmaceutical product containing Acetyl Salicylic Acid (aka ASA) and Eugenol. Rainbow is headquartered at 3400 14th Avenue, Unit 22, Markham, ON, Canada L3R 0H7.

5. DOES 1-10 inclusive, are yet unknown to Plaintiff by their true identity but are herein sued under fictitious names; when their true names are known, Plaintiff will amend this Complaint along with the named Defendants, each DOE Defendant is a proximate cause of Plaintiffs' harm.

## ALLEGED FACTS COMMON TO ALL CAUSES OF ACTION

6. Plaintiff is a resident of the State of California.

7. Plaintiff's rights, as well as the rights of all California residents similarly situated as consumers of dental care and specifically oral surgery, have been subject to injury as a result of negligent certification processes employed by the Oral Maxillofacial Surgeons National Insurance Company (hereinafter "OMSNIC").

8. Plaintiff, as well as all similarly situated consumers of dental care and specifically oral surgery, have a right to rely upon a belief that oral surgery will be competently performed by dental practitioners holding themselves out to be competent to practice oral surgery.

9. Competent oral surgeons hold themselves out to the public and potential patients with the aid of advertising the existence of having dental malpractice insurance.

10. The ability of an oral surgeon to obtain dental malpractice insurance holds out to the public and gives the appearance of competence as a dental practitioner.

11. Prior to April 17, 2015 Plaintiff alleges to have not had any symptoms of right-lower lingual nerve injury.

12. On or about March 25, 2015, Plaintiff inquired at the dental office of

Lonnie W. Tiner, DDS (hereinafter "Lonnie W. Tiner, DDS", "Lonnie W. Tiner" or "Dr. Tiner") in Yucca Valley, California for diagnosis and possible treatment of her painful right-lower wisdom tooth.

13. On or about March 25, 2015 Plaintiff was made aware by Dr. Tiner's office that Dr. Tiner carried dental malpractice insurance.

14. Plaintiff's March 25, 2015 decision to choose Dr. Tiner to perform her right-lower wisdom tooth extraction was created by Plaintiff's reliance upon the impression made to Plaintiff by Dr. Tiner's office, that Dr. Tiner carried dental malpractice insurance.

15. On or about April 9, 2015 underwent a pre-operative extraction evaluation of her right-lower wisdom tooth by Dr. Tiner.

16. On or about April 9, 2015 Dr. Tiner was more than 80 years old and practicing oral surgery as a solo-practitioner in his Yucca Valley California office.

17. During the April 9, 2015 pre-operative extraction evaluation of her right-lower wisdom tooth by Dr. Tiner in his Yucca Valley California office, Dr. Tiner failed to perform a generally accepted oral surgery "#17, #32 nerve injury risk assessment".

18. During the April 9, 2015 pre-operative extraction evaluation of her right-lower wisdom tooth by Dr. Tiner in his Yucca Valley California office, Dr. Tiner failed to discuss, inform or provide acknowledgement to Plaintiff concerning Plaintiff's #17, #32 nerve injury risk.

19. During the April 9, 2015 pre-operative extraction evaluation of her right-lower wisdom tooth by Dr. Tiner in his Yucca Valley California office, Dr. Tiner's clinical notes failed to reveal that Plaintiff had a high potential for #17, #32 nerve injury risk.

20. On or about April 17, 2015, Plaintiff underwent the extraction of her right-lower wisdom tooth. The extraction was performed by Dr. Lonnie W. Tiner, DDS in his Yucca Valley California office.

21. Plaintiff alleges that since she did not have any symptoms of lingual nerve

injury prior to the April 17, 2015 extraction of her right-lower wisdom tooth, but did have symptoms of right-lower lingual nerve injury following the April 17, 2015 extraction of her right-lower wisdom tooth - during the April 17, 2015 extraction procedure of her right-lower wisdom tooth, *something* caused Plaintiff's right-lower lingual nerve was severed.

22. Plaintiff alleges that no one other than the oral surgeon, Dr. Lonnie W. Tiner, DDS who extracted Plaintiff's right-lower wisdom tooth could have caused her right-lower lingual nerve to become severed.

23. Plaintiff alleges that on or about April 17, 2015 Plaintiff *could only* have suffered a neurological injury to her right-lower lingual nerve as a result of a wisdom tooth extraction performed by Dr. Lonnie W. Tiner as well as treatment resulting from Dr. Tiner's post-operative care of Plaintiff.

24. On or about April 22, 2015 Plaintiff returned to Dr. Tiner's office complaining of intractable pain in her jaw, to which Dr. Tiner packed Plaintiff's freshly formed wisdom tooth socket with gauze impregnated with chemicals to which Plaintiff was not informed by Dr. Tiner as to the contents thereof.

25. On or about April 24, 2015 Plaintiff returned to Dr. Tiner's office complaining of intractable pain in her jaw, to which Dr. Tiner packed Plaintiff's freshly formed wisdom tooth socket with gauze impregnated with chemicals to which Plaintiff was not informed by Dr. Tiner as to the contents thereof.

26. On or about April 27, 2015 Plaintiff returned to Dr. Tiner's office complaining of intractable pain in her jaw, to which Dr. Tiner packed Plaintiff's freshly formed wisdom tooth socket with gauze impregnated with chemicals to which Plaintiff was not informed by Dr. Tiner as to the contents thereof.

27. On or about April 28, 2015 Plaintiff returned to Dr. Tiner's office complaining of intractable pain in her jaw, to which Dr. Tiner packed Plaintiff's freshly formed wisdom tooth socket with gauze impregnated with chemicals to which Plaintiff was not informed by Dr. Tiner as to the contents thereof.

28. On or about May 7, 2015 Plaintiff returned to Dr. Tiner's office complaining of intractable pain in her jaw, to which Dr. Tiner packed Plaintiff's freshly formed wisdom tooth socket with gauze impregnated with chemicals to which Plaintiff was not informed by Dr. Tiner as to the contents thereof.

29. It was not until June 30, 2016 that Plaintiff discovered that the gauze to which Dr. Tiner packed Plaintiff's painful right-lower wisdom tooth socket no less than five times, was impregnated with a product called Dressol-X that contains the chemicals "ASA" and "Eugenol".

30. On or about May 18, 2015 Dr. Lonnie W. Tiner, DDS died.

31. California law is well settled that a medical practitioner's duty to a patient does not end after a surgical procedure is completed - regardless of whether the procedure was successful or not.

32. Following Plaintiff's alleged April 17, 2015 neurological injury resulting from the extraction of Plaintiff's right-lower wisdom tooth, Plaintiff's relationship to Dr. Tiner did not end and Plaintiff was entitled to continued care from Dr. Tiner.

33. Following Plaintiff's alleged April 17, 2015 neurological injury resulting from the extraction of Plaintiff's right-lower wisdom tooth, Plaintiff's relationship to Dr. Tiner did not end and Plaintiff was entitled to continued care from Dr. Tiner regardless of whether or not there was any implication that Dr. Tiner's oral surgical skills were or where not competent.

34. Following Plaintiff's alleged April 17, 2015 neurological injury resulting from the extraction of Plaintiff's right-lower wisdom tooth, Plaintiff did not receive continual follow-up treatment from Dr. Tiner or Dr. Tiner's Estate.

35. Following Dr. Tiner's May 18, 2015 death, Plaintiff attempted to locate and contact Dr. Tiner's estate for the purpose of communicating her lingual nerve injury claim.

36. Plaintiff's post-operative need to contact and obtain a settlement from Dr. Tiner's Estate or Dr. Tiner's dental malpractice insurance company, if such a malpractice

insurance policy existed, was necessary for the purpose of Plaintiff's obtaining sufficient funds for corrective microsurgery to repair the injured lingual nerve prior to six months following the initial lingual nerve injury.

37. Following Dr. Tiner's May 18, 2015 death, Plaintiff's, Plaintiff made diligent attempts to establish contact and obtain follow-up care from Dr. Tiner or Dr. Tiner's Estate.

38. Following Dr. Tiner's May 18, 2015 death, Plaintiff made diligent attempts to establish contact and obtain follow-up care from Dr. Tiner and/or Dr. Tiner's Estate - but Plaintiff's attempts went unanswered from either Dr. Tiner or Dr. Tiner's Estate.

39. On or about July 1, 2015 Plaintiff mailed a letter to the person Plaintiff had discovered *might* be Dr. Tiner's son, Christopher Tiner, MD, DDS who lived and practiced oral surgery in Pasadena California.

40. Plaintiff never received any response from Christopher Tiner or any purported representative of Dr. Tiner's Estate as a result of the July 1, 2015 letter sent to Christopher Tiner.

41. Plaintiff's letter to Christopher Tiner included the fact that it was extremely important that Dr. Tiner's estate respond because within six months following Plaintiff's injury, such microsurgical repair would be unlikely or impossible.

42. On or about December 1, 2015 Plaintiff alleges to have suffered a permanent oral neurological injury as a result of being unable to obtain a direct or indirect line of communication with Dr. Tiner's Estate and/or from being able to contact Dr. Tiner's dental malpractice insurance company if such an insurance policy existed so to report her claim of injury and for settlement purposes.

43. On or about March 15, 2016, without being provided any proof thereto, Plaintiff came to learn that Dr. Tiner's Estate might be under the *quasi-control* of Dr. Lonnie W. Tiner's son, Christopher Tiner, MD, DDS.

44. Christopher Tiner, MD, DDS is a qualified and practicing oral surgeon duly licensed by the State of California who lived and practices in Pasadena, California.

45. On or about March 15, 2016, Plaintiff requested that Dr. Tiner's Estate confirm and/or authenticate that Dr. Tiner had a valid dental malpractice insurance policy, but Plaintiff's requests when unanswered.

46. On or about April 10, 2016, Plaintiff was informed by an OMSNIC office in Long Beach California that according to records available at that office, Dr. Lonnie W. Tiner, DDS of Yucca Valley California did not have a dental malpractice insurance policy with OMSNIC.

47. On or about June 30, 2016, Plaintiff was informed by an attorney who called himself "Hugh A. McCabe", purporting to be representing Dr. Tiner's Estate, that Dr. Tiner had a valid dental malpractice insurance policy, but at that time, McCabe did not provide Plaintiff with either authentic proof of representation of Dr. Tiner's Estate or any authentic documents constituting Dr. Tiner's dental malpractice "proof of insurance".

48. On or about June 30, 2016 Hugh A. McCabe held himself out to Plaintiff as being a "medical malpractice" specialist-attorney but Plaintiff could not discover either through the State Bar of California, continuing legal education records or institutions of higher learning - any evidence that McCabe owned credential to such.

49. Since on or about June 30, 2016, Hugh A. McCabe continually made false and misleading references to Plaintiff's July 1, 2015 *"Notice of Claim and Offer to Settle"* letter that Plaintiff sent to Christopher Tiner - as a *"Notice to Sue"*- despite there being no portion of Plaintiff's July 1, 2015 letter to Christopher Tiner that could be interpreted as a notice to sue.

50. Plaintiff alleges that McCabe's false and misleading references to Plaintiff's July 1, 2015 *"Notice of Claim and Offer to Settle"* as a *"Notice to Sue"*- was done by McCabe for the purpose of covering up the negligent and unlawful failure of OMSNIC and/or OMSNIC's representative to timely respond to Plaintiff's July 1, 2015 *"Notice of Claim and Offer to Settle"*.

51. Up to the filing date of this lawsuit, Plaintiff does not know if Dr. Tiner had a valid dental malpractice insurance policy on or about April 17, 2015.

**FIRST CAUSE OF ACTION**
**NEGLIGENCE,**
**NEGLIGENT CLAIM HANDLING AND**
**NEGLIGENT DENTAL MALPRACTICE INSURANCE POLICY UNDERWRITING**
**Defendants: OMSNIC,**

52. Plaintiff fully incorporates all preceding paragraphs of this Complaint into this cause of action as fully setout hereto.

53. Civil Code §1714(a) provides in part: "Everyone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself or herself."

54. "Although it is true that some exceptions have been made to the general principle that a person is liable for injuries caused by his failure to exercise reasonable care in the circumstances, it is clear that in the absence of statutory provision declaring an exception to the fundamental principle enunciated by §1714 of the Civil Code, no such exception should be made unless clearly supported by public policy.", *Rowland v. Christian (1968) 69 Cal.2d 108*.

55. "The elements of a cause of action for negligence are well established. They are "(a) a legal duty to use due care; (b) a breach of such legal duty; [and] (c) the breach as the proximate or legal cause of the resulting injury.", *Ladd v. County of San Mateo (1996) 12 Cal.4th 913, 917*.

56. "The existence of a duty is a question of law for the court.", *Ky. Fried Chicken of Cal. v. Superior Court (1997) 14 Cal.4th 814, 819*.

57. "In the Rowland [Rowland, supra, 69 Cal.2d at p. 113] decision, this court identified several considerations that, when balanced together, may justify a departure from the fundamental principle embodied in Civil Code section 1714: 'the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the

closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.' As we have also explained, however, in the absence of a statutory provision establishing an exception to the general rule of Civil Code section 1714, courts should create one only where 'clearly supported by public policy.", *Cabral v. Ralphs Grocery Co. (2011) 51 Cal.4th 764, 771*

58. "The concept of foreseeability of risk of harm in determining whether a duty should be imposed is to be distinguished from the concept of " 'foreseeability" in two more focused, fact-specific settings' to be resolved by a trier of fact. 'First, the [trier of fact] may consider the likelihood or foreseeability of injury in determining whether, in fact, the particular defendant's conduct was negligent in the first place. Second, foreseeability may be relevant to the [trier of fact's] determination of whether the defendant's negligence was a proximate or legal cause of the plaintiff's injury.' " (*Burns v. Neiman Marcus Group, Inc. (2009) 173 Cal.App.4th 479*, 488, fn. 8)

59. "By making exceptions to Civil Code section 1714's general duty of ordinary care only when foreseeability and policy considerations justify a categorical no-duty rule, we preserve the crucial distinction between a determination that the defendant owed the plaintiff no duty of ordinary care, which is for the court to make, and a determination that the defendant did not breach the duty of ordinary care, which in a jury trial is for the jury to make. . . . While the court deciding duty assesses the foreseeability of injury from 'the category of negligent conduct at issue,' if the defendant did owe the plaintiff a duty of ordinary care the jury 'may consider the likelihood or foreseeability of injury in determining whether, in fact, the particular defendant's conduct was negligent in the first place.' An approach that instead focused the duty inquiry on case- specific facts would tend to 'eliminate the role of the jury in negligence cases, transforming the question of whether a defendant breached the duty of care under the facts of a particular

case into a legal issue to be decided by the court . . . .' " (*Cabral,51 Cal.4th at pp. 772–773*)

60. "While foreseeability with respect to duty is determined by focusing on the general character of the event and inquiring whether such event is 'likely enough in the setting of modern life that a reasonably thoughtful [person] would take account of it in guiding practical conduct', foreseeability in evaluating negligence and causation requires a 'more focused, fact-specific' inquiry that takes into account a particular plaintiff's injuries and the particular defendant's conduct." (*Laabs v. Southern California Edison Company (2009) 175 Cal.App.4th 1260, 1273*).

61. OMSNIC as a national dental malpractice insurance company has a duty to consumers of dental care, specifically oral surgery, whereby consumers of oral surgery care choose to employ the services of OMSNIC's insureds.

62. Consumers of oral surgery services rely upon an oral surgeon to have dental malpractice insurance.

63. OMSNIC is in the business of providing dental malpractice insurance to oral surgeons.

64. The purpose of OMSNIC's business is to benefit its insured by paying for claims resulting from alleged dental malpractice that may be brought against OMSNIC's insured.

65. OMSNIC's benefit to its insured is specifically for the purpose of protecting the insured personal assets against liability in the event of a claim that might be made against the insureds as a result of mistake, error, omission or incompetency.

66. The purpose of OMSNIC's business is to benefit and compensate patients of OMSNIC's insured who have suffered injuries as a result of dental malpractice.

67. OMSNIC's business operates on the principle that OMSNIC's insured pay yearly premiums to OMSNIC in exchange for OMSNIC's promise to pay and/or protect the personal assets of its insured from liability stemming from claims of dental malpractice.

68. OMSNIC's business practices operate on a *profit principal* whereby the less OMSNIC has to pay-out in claims, the higher OMSNIC's profit margin will be.

69. It should not be and is strictly unlawful for any insurance company to employ the practice of "hiding from" or "avoiding" or "failing to respond" to claimants.

70. Plaintiff has properly alleged herein that if Dr. Tiner possessed a valid dental malpractice insurance policy through OMSNIC on or about April 17, 2015, then OMSNIC *hide* itself from Plaintiff by not *responding* to Plaintiff's July 1, 2015 notice of claim for the purpose of *avoiding* to process Plaintiff's claim against Dr. Tiner.

71. Plaintiff alleges that the reason OMSNIC hide, avoided and failed to respond to Plaintiff's July 1, 2015, OMSNIC was employing the age-old insurance company relay-routine of *"wait and see - maybe the claimant with just go away"*.

72. OMSNIC's employment of *ignoring* Plaintiff simply on the hopes that Plaintiff would *go away* - caused Plaintiff to suffer a life-long permanent neurological injury.

73. Once an oral surgery patient-consumer chooses to employ the services of an oral surgeon who OMSNIC has properly certified as qualifying for dental malpractice insurance then OMSNIC has extended its duty of care to that patient.

74. OMSNIC as a provider of dental malpractice insurance coverage, has a duty of care which includes; **(a)** providing a financially sound insurance company, **(b)** providing competent claims processing services, and **(c)** employing competent risk management analysis in determining an insured's eligibility for dental malpractice insurance.

75. Plaintiff alleges that as a consumer of dental care, specifically oral surgery - Plaintiff was entitled to the services of a competent oral surgeon - who if possessing valid dental malpractice insurance, would thus entitle Plaintiff to the protection, benefits and duties owed to the oral surgeon by the dental malpractice insurance company.

76. Plaintiff alleges that OMSNIC owed a duty of care to Plaintiff to provide a benefit to Plaintiff as well as all similarly situated patients who have suffered an alleged

dental malpractice injury.

77. Plaintiff alleges that one of the most essential benefits Plaintiff was entitled to from OMSNIC, was that of having the ability to be able to report a claim of injury to OMSNIC. Specifically, a claim of dental malpractice stemming from injuries resulting from the dental malpractice of OMSNIC's insureds.

78. Plaintiff alleges that if Plaintiff was effectively precluded from submitting an alleged dental malpractice injury claim to OMSNIC, or if OMSNIC actually received such a claim but never processed it, or if OMSNIC might allege to have never received such a claim - then OMSNIC would never have to pay any benefit to Plaintiff.

79. Plaintiff alleges that another essential benefit Plaintiff was entitled to from OMSNIC, was that of relying upon OMSNIC to employ proper risk management analysis prior to issuing a dental malpractice insurance policy to a potential insured.

80. Plaintiff alleges that the ultimate benefit Plaintiff was entitled to from OMSNIC, was that of monetary compensation for injuries resulting from the dental malpractice of OMSNIC's insureds.

81. Plaintiff alleges that OMSNIC owed a duty of care to Plaintiff to provide competent claims processing services.

82. Plaintiff alleges that OMSNIC owed a duty of care to Plaintiff to employ competent risk management analysis in determining an insured's eligibility for dental malpractice insurance.

83. Plaintiff alleges that OMSNIC failed to employ proper risk management analysis when it issued a dental malpractice insurance policy to Dr. Tiner, if such an insurance policy existed on or about April 17, 2015.

84. Plaintiff alleges that OMSNIC failed to provide Plaintiff with competent claims handling policies and practices.

85. Plaintiff alleges that up to the filing date of this lawsuit, Plaintiff has not yet been provided with any legally authentic documents that prove Dr. Tiner had dental malpractice insurance on or about April 17, 2015, which was the date of Plaintiff's right-

lower lingual nerve injury.

86. If OMSNIC can prove that Dr. Tiner had a valid dental malpractice insurance policy on or about April 17, 2015, and as a result of OMSNIC's failure to provide Plaintiff with the benefit of proper risk management analysis, OMSNIC improperly issued a dental malpractice insurance policy to an incompetent oral surgeon who subjected Plaintiff to unnecessary injury, pain and life-time suffering.

87. If OMSNIC can prove that Dr. Tiner had a valid dental malpractice insurance policy on or about April 17, 2015, and as a result of OMSNIC's failure to provide Plaintiff with the benefit of competent claims handling, OMSNIC improperly handled Plaintiff's initial claims for dental malpractice against Dr. Tiner – thus OMSNIC caused Plaintiff to be subjected to unnecessary injury, pain and life-time suffering.

88. For the purpose of establishing the running of applicable statute of limitations concerning this claim for negligent insurance underwriting and/or negligent insurance claim handling being brought by Plaintiff against OMSNIC, it was not until June 30, 2016 that Plaintiff came to know, without any certainty, that Dr. Tiner *might* have possessed a valid dental malpractice insurance policy on or about April 17, 2015.

89. For the purpose of establishing the running of the applicable statute of limitations concerning this claim for negligent insurance underwriting and/or negligent insurance claim handling, up to the date of the filing of this lawsuit, it has not been established whether or not Dr. Lonnie W. Tiner possessed a valid dental malpractice insurance policy from OMSNIC or any other dental malpractice insurance company on or about April 17, 2015.

90. For the purpose of establishing the running of applicable statute of limitations concerning this claim for negligent insurance underwriting and/or negligent insurance claim handling, it was not until June 30, 2016 that Plaintiff came to know without any certainty or proof, Hugh A. McCabe might be a Dr. Tiner Estate representative.

91. For the purpose of establishing the running of applicable statute of

limitations concerning this claim for negligent insurance underwriting and/or negligent insurance claim handling, it was not until June 30, 2016 that Plaintiff came to know without any certainty or proof, Hugh A. McCabe might have been retained by OMSNIC to represent the Estate of Lonnie W. Tiner or any Dr. Tiner entity interest against Plaintiff's dental malpractice claim.

92. Up to the date of the filing of this lawsuit, it has not been legally established that OMSNIC was ever or was at the time of Plaintiff's alleged dental malpractice injury, that being April 17, 2015 Dr. Lonnie W. Tiner's dental malpractice insurance company.

## NEGLIGENT INSURANCE POLICY UNDERWRITING

93. Plaintiff fully incorporates all preceding paragraphs of this Complaint into this cause of action as fully setout hereto.

94. OMSNIC, by way of being in the business of insuring oral surgeons against alleged claims of dental /oral surgical malpractice, is knowledgeable to the facts, circumstances and conditions that constitute "risk management" when considering any applicant for oral surgery malpractice insurance.

95. If OMSNIC can prove that Dr. Tiner had a valid dental malpractice insurance policy on or about April 17, 2015, then OMSNIC must show that on or about a date prior to April 17, 2015, Dr. Tiner submitted a renewal application to OMSNIC at OMSNIC's home office in Rosemont, IL for the purpose of obtaining a dental malpractice insurance policy.

96. If OMSNIC can prove that Dr. Tiner had a valid dental malpractice insurance policy on or about April 17, 2015, then OMSNIC must show that on or about a date prior to April 17, 2015, OMSNIC employed its established policies and practices of evaluating the potential risk involved with insuring Dr. Tiner against dental malpractice.

97. If OMSNIC can prove that Dr. Tiner had a valid dental malpractice insurance policy on or about April 17, 2015, then OMSNIC must show that on a date prior to April 17, 2015, OMSNIC approved Dr. Tiner's application for dental

malpractice.

98. If OMSNIC can prove that Dr. Tiner had a valid dental malpractice insurance policy on or about April 17, 2015, then Plaintiff will show that OMSNIC's act of approving Dr. Tiner for a dental malpractice insurance policy was negligent because on a date prior to April 17, 2015, Dr. Tiner presented a *higher than acceptable* degree of risk of committing dental malpractice.

99. It is a generally accepted national standard that the number of practicing oral surgeons are between the ages of 30 – 55 years old.

100. It is a generally accepted national standard that the number of practicing oral surgeons greater than 80 years old is essentially a non-significant number.

101. It is a generally accepted national standard that a human beings' ability to perform mental, physical and dextorative tasks as a result of increased age related bio-physiological functionality decreases predictably after the age of 70 years.

102. It is a generally accepted national standard that obtaining employment by way of hire from any business or governmental agency after the age of 80 years is essentially impossible.

103. It is a generally accepted national standard that obtaining any type of license to practice a profession within state or federal mandated regulatory guidelines such as law, medicine or dentistry is essentially impossible after the age of 80 years.

104. It is a generally accepted that because person's over the age of 80 are more likely to be involved in motor vehicle accidents and death from accidents, the ability to keep and maintain a driver's license after the age of 80 is subject to renewal every three years.

105. It is a generally accepted national standard that obtaining any type of insurance designed to protect ones personal assets from liability and/or accident/injury/death becomes increasing difficult and costly after the age of 80 years.

106. If OMSNIC can prove that Dr. Tiner had a valid dental malpractice insurance policy on or about April 17, 2015, then OMSNIC will show that despite Dr.

Tiner's age of being greater than 80 years old, practicing as a solo-practitioning oral surgeon absent any affiliation with any other oral surgeon, and having a recent history in 2012 of being declared incompetent, grossly negligent and practicing cosmetic surgery without a proper license, by the California Attorney General's Office, OMSNIC approved Dr. Tiner's application for dental malpractice insurance.

107.   If OMSNIC can prove that Dr. Tiner had a valid dental malpractice insurance policy on or about April 17, 2015, then Plaintiff will show that OMSNIC's act of approving Dr. Tiner's application for a dental malpractice insurance policy was negligent because Dr. Tiner presented a *higher than acceptable* degree of risk of committing dental malpractice because Dr. Tiner was greater than 80 years old.

108.   If OMSNIC can prove that Dr. Tiner had a valid dental malpractice insurance policy on or about April 17, 2015, then Plaintiff will show that OMSNIC's act of approving Dr. Tiner for a dental malpractice insurance policy was negligent because Dr. Tiner presented a *higher than acceptable* degree of risk of committing dental malpractice because Dr. Tiner was not associated with any other practicing oral surgeon who might aid Dr. Tiner under conditions in which Dr. Tiner's age, mental status, dextorative skills and judgment /decision making might be adversely affected by being greater than 80 years old.

109.   If OMSNIC can prove that Dr. Tiner had a valid dental malpractice insurance policy on or about April 17, 2015, then Plaintiff will show that OMSNIC's act of approving Dr. Tiner for a dental malpractice insurance policy was negligent because Dr. Tiner presented a *higher than acceptable* degree of risk of committing dental malpractice because in 2012, Dr. Tiner had been admonished by the California Attorney General for Incompetency, Gross Negligence and Practicing Cosmetic Surgery without a proper license.

110.   If OMSNIC can prove that Dr. Tiner had a valid dental malpractice insurance policy on or about April 17, 2015, then Plaintiff will show that as a direct and proximate result of OMSNIC's negligent approval of Dr. Tiner's dental malpractice

insurance policy, Dr. Tiner was provided with a *false sense of confidence* in his ability to practice solo-practitioner oral surgery absent any affiliation with another qualified oral surgeon.

111. If OMSNIC can prove that Dr. Tiner had a valid dental malpractice insurance policy on or about April 17, 2015, then Plaintiff will show that as a direct and proximate result of OMSNIC's negligent approval of Dr. Tiner's dental malpractice insurance policy, Dr. Tiner was allowed to *hold-himself* out to the public in Yucca Valley, California as qualifying for a dental malpractice insurance policy to which consumers rely on in choosing an oral surgeon.

112. If OMSNIC can prove that Dr. Tiner had a valid dental malpractice insurance policy on or about April 17, 2015, then Plaintiff will show that if OMSNIC had not negligently approved Dr. Tiner's dental malpractice insurance policy on or about a date prior to April 17, 2015, it is *more likely than not* that Dr. Tiner would not have continued practicing oral surgery as a solo- practitioner oral surgeon and would have thus not injured Plaintiff on or about April 17, 2015.

113. If OMSNIC can prove that Dr. Tiner had a valid dental malpractice insurance policy on or about April 17, 2015, then OMSNIC will have to prove that OMSNIC knew or should have known that;

a) At the time OMSNIC approved the underwriting of Dr. Tiner's dental malpractice insurance policy or no later than on or about April 17, 2015, Dr. Lonnie W. Tiner was more than 80 years old.

b) At the time OMSNIC approved the underwriting of Dr. Tiner's dental malpractice insurance policy or no later than on or about April 17, 2015 Dr. Lonnie W. Tiner was practicing oral surgery as a solo practitioner in Yucca Valley, California without the supervision or help of a younger surgeon.

c) At the time OMSNIC approved the underwriting of Dr. Tiner's dental malpractice insurance policy or no later than on or about April 17, 2015 Dr. Lonnie W. Tiner was practicing oral surgery as a solo practitioner in Yucca Valley, California

despite having been convicted by the California Dental Board by way of "accusation" in December 2012 for negligence, incompetence, and practicing cosmetic surgery without a license.

d) At the time OMSNIC approved the underwriting of Dr. Tiner's dental malpractice insurance policy or no later than on or about April 17, 2015 Dr. Lonnie W. Tiner's OMSNIC dental malpractice insurance policy information indicated Dr. Tiner's mailing address of record to be the home address of Dr. Tiner's son, Christopher Tiner, MD, DDS in Pasadena California.

e) At the time OMSNIC approved the underwriting of Dr. Tiner's dental malpractice insurance policy or no later than on or about April 17, 2015 Dr. Lonnie W. Tiner's OMSNIC dental malpractice insurance policy information were being sent via U.S.P.S. by OMSNIC to the home address of Dr. Tiner's son, Christopher Tiner, MD, DDS in Pasadena California.

f) At the time OMSNIC approved the underwriting of Dr. Tiner's dental malpractice insurance policy or no later than on or about April 17, 2015 Dr. Lonnie W. Tiner's OMSNIC dental malpractice insurance policy information did not contain Dr. Lonnie W. Tiner's oral surgery office address in Yucca Valley, California.

g) At the time OMSNIC approved the underwriting of Dr. Tiner's dental malpractice insurance policy or no later than on or about April 17, 2015 Dr. Lonnie W. Tiner's dental malpractice insurance policy information was being sent by OMSNIC to the home address of Dr. Tiner's son, Christopher Tiner, MD, DDS in Pasadena California and that OMSNIC's policy information did not contain the business name of Dr. Lonnie W. Tiner's Hi-Desert Oral & Maxillofacial Surgery Center in Yucca Valley, California, or any other name that might associate Dr. Tiner's oral surgery practice to an office or business.

h) At the time OMSNIC approved the underwriting of Dr. Tiner's dental malpractice insurance policy or no later than on or about April 17, 2015 Dr. Lonnie W. Tiner's OMSNIC dental malpractice insurance policy information indicated that Dr.

Tiner was not being charged unreasonably high premiums considering Dr. Tiner's risk factors.

114. As Plaintiff has properly alleged herein, on or about April 17, 2015 Plaintiff went into Dr. Tiner's Yucca Valley California oral surgery office without any symptoms of right-lower lingual nerve injury, but left Dr. Tiner's Yucca Valley California oral surgery office on April 17, 2015 with symptoms a right-lower lingual nerve injury.

115. Whether or not. Dr. Lonnie W. Tiner's or other dental practitioner's alleged conduct of employing an improper extraction technique, improper use of local anesthetic, or improper post-operative measures was a direct or indirect cause of Plaintiff's alleged lingual nerve injury or injury involving any other such similarly situated patient, does not relief OMSNIC of the foreseeable liability resulting from OMSNIC's negligent underwriting of a dental malpractice insurance policy to Dr. Tiner or other dental practitioner, whereby such a policy should never have been issued.

116. OMSNIC as a professional dental malpractice insurance underwriter, knew or should have known of the foreseeability of injury to the oral surgery-consuming public that insuring a high risk oral surgeon carried with it.

117. But for, OMSNIC's negligent approval of Dr. Tiner's dental malpractice insurance policy prior to April 17, 2015, Dr. Tiner would not have been placed in the *stream of commerce* and more likely than not, would not have been practicing solo oral surgery from his Yucca Valley, California office on or about April 17, 2015.

118. But for, OMSNIC's negligent approval of Dr. Tiner's dental malpractice insurance policy prior to April 17, 2015, Plaintiff would not have selected Dr. Tiner as a competent oral surgeon absent having dental malpractice insurance.

119. But for, OMSNIC's negligent approval of Dr. Tiner's dental malpractice insurance policy prior to April 17, 2015, Dr. Tiner would not have failed to the required standard oral surgery #17, #32 nerve risk injury assessment.

120. But for, OMSNIC's negligent approval of Dr. Tiner's dental malpractice insurance policy prior to April 17, 2015, Plaintiff would not have been subject to the

extraction of her right-lower wisdom tooth by Dr. Tiner, and Plaintiff would not have to live with the day-to-day suffering that the permanent oral neurological and anatomical injury presents.

121. As a proximate result of OMSNIC's negligent approval of Dr. Tiner's dental malpractice insurance policy on a date prior to April 17, 2015, Plaintiff detrimentally relied on the presumption that since Dr. Tiner was able to obtain dental malpractice insurance, then Dr. Tiner was a competent oral surgeon.

122. If OMSNIC can prove that Dr. Tiner had a valid dental malpractice insurance policy on or about April 17, 2015, then Plaintiff will show that a dental malpractice insurance policy covers Dr. Tiner for injuries to patients of Dr. Tiner whether the injuries come by way of Dr. Tiner's negligence, accident, omission or error.

123. As a proximate result of OMSNIC's negligent approval of Dr. Tiner's dental malpractice insurance policy on a date prior to April 17, 2015, Plaintiff has suffered permanent life-long injury to which Plaintiff is entitled to compensation different, separate and distinct from damage compensation that resulted from Dr. Tiner's oral surgical technique(s) that allegedly injured Plaintiff.

124. As a proximate result of OMSNIC's negligent approval of Dr. Tiner's dental malpractice insurance policy on a date prior to April 17, 2015, Plaintiff has suffered permanent life-long injury to which Plaintiff is entitled to compensation in accordance with proof at trial.

## NEGLIGENT INSURANCE CLAIMS HANDLING

125. Plaintiff fully incorporates all preceding paragraphs of this Complaint into this cause of action as fully setout hereto.

126. On or about June 30, 2016, Plaintiff was informed by an attorney who identified himself as Hugh A. McCabe and purported to represent the late Dr. Tiner's Estate.

127. On or about June 30, 2016, despite being requested, Hugh A. McCabe did not produce to Plaintiff any documents purporting to be "proof of representation" of Dr.

Tiner's Estate or OMSNIC.

128. On or about June 30, 2016, McCabe informed Plaintiff that Dr. Tiner had a dental malpractice insurance policy and that the said policy had been in effect as of the date of Plaintiff's April 17, 2015 alleged injury.

129. On or about June 30, 2016, McCabe could not provide Plaintiff with any authentic proof of insurance documents supporting the existence of a dental malpractice insurance policy belonging to Dr. Tiner.

130. Plaintiff's subsequent requests to McCabe after June 30, 2016 for authenticated proof of insurance documents went unanswered.

131. Prior to, or up to June 30, 2016 and up to the date of filing of this lawsuit, no authentic information necessary to positively identity a dental malpractice insurance company associated with a dental malpractice insurance policy belonging to Dr. Tiner has been presented to Plaintiff.

132. Prior to June 30, 2016, all diligent efforts made by Plaintiff to discover and authenticate the existence of a Dr. Lonnie W. Tiner's dental malpractice insurance policy were unsuccessful.

133. If OMSNIC can prove that Dr. Tiner had a valid dental malpractice insurance policy on or about April 17, 2015, then Plaintiff will show that prior to June 30, 2016, attorney Hugh A. McCabe, Christopher Tiner, attorney Dane Bitterlin committed assertive acts purposed in obstructing Plaintiff from discovering information necessary to authenticate Dr. Tiner's purported dental malpractice insurance policy.

134. If OMSNIC can prove that Dr. Tiner had a valid dental malpractice insurance policy on or about April 17, 2015, then Plaintiff will show that the assertive acts by Hugh A. McCabe, Christopher Tiner, Dane Bitterlin purposed in obstructing Plaintiff from discovering any information necessary to authenticate Dr. Tiner's purported dental malpractice insurance policy were unlawful in accordance with California agency law, Probate Code, Insurance Code, concealing evidence law, suborning perjury law, forgery law, and/or conspiracy to obstruct justice law.

135. This lawsuit serves as a platform to; **(a)** compel OMSNIC to produce legally sufficient documents necessary to authenticate and prove whether or not Dr. Tiner possessed dental malpractice insurance on the date of Plaintiff's alleged April 17, 2015 dental malpractice injury, **(b)** establish whether Dr. Tiner's Estate representatives while acting in the capacity of the late Dr. Lonnie W. Tiner's Estate, purposely and knowingly violated California agency law, Probate Code, Insurance Code, concealing evidence law, suborning perjury law, forgery law, and/or conspiracy to obstruct justice law - during the performance of duties in managing the late Dr. Tiner's Estate which involved the processes of receiving, acknowledging Plaintiff's July 1, 2015 notice of claim and offer to settle, and **(c)** establish whether Dr. Tiner's Estate representatives purposely and knowingly concealed, committed perjury, forgery, insurance fraud, and/or obstructed justice during the processes of failing to provide Plaintiff with authenticate proof of insurance documents, and

136. As of the filing date of this lawsuit, it is not known by Plaintiff, but must be proven by OMSNIC that on or about August 1, 2015, Dr. Tiner's son, Christopher Tiner, MD, DDS forwarded Plaintiff's Code Civil Proc 364(a) Notice of Claim and Offer to Settle to Dr. Tiner's Dental Malpractice Insurance Company (OMSNIC), who would have received such notice by way of due course of U.S.P.S. or other acceptable form of communication.

137. As of the filing date of this lawsuit, it is not known by Plaintiff, but must be proven by OMSNIC, as a direct result of Plaintiff's July 15, 2015 communication with Dr. Tiner's son, Christopher K. Tiner, MD, DDS and thus the resultant August 1, 2015 communication to OMSNIC, OMSNIC *knew with reasonable certainty*, because of OMSNIC's professional association and special relationship to the practice of oral surgery - a patient with a lingual nerve injury only has a limited chance of successful recovery using known techniques of microsurgical intervention - that being within the 6 – 12 months following the injury. After that time, the possibility of any recovery from a severed lingual nerve using microsurgical intervention is essentially zero.

138.   As of the filing date of this lawsuit, it is not known by Plaintiff, but must be proven by OMSNIC on a date after July 1, 2015, that OMSNIC knew with reasonable certainty, because of the information Plaintiff provided to OMSNIC in the July 1, 2015 certified letter forwarded to OMSNIC, as well as the California Fair Claim Settlement Practices Regulation 2695.5 *et seq*, it would be necessary for OMSNIC to contact Plaintiff soon as practical for the purpose of **(a)** providing Plaintiff with information regarding claim processing, **(b)** disclosing financial settlement resources available through the Estate of Lonnie W. Tiner and/or **(c)** providing inquiry into proof of claim.

139.   As of the filing date of this lawsuit, it is not known by Plaintiff, but must be proven by OMSNIC that OMSNIC knew after July 1, 2015 with reasonable certainty to owe a duty of care to a potential claimant such as Plaintiff and/or person's who might have financial claims against Lonnie W. Tiner resulting from alleged dental malpractice, and that California Insurance law provides that OMSNIC's duty as an insurance company includes promptly responding to and contacting *anyone* making a claim against one of its insureds.

140.   As of the filing date of this lawsuit, it is not known by Plaintiff, but must be proven by OMSNIC, that at a time after July 1, 2015 OMSNIC came to know of Plaintiff's potential dental malpractice claim against Dr. Tiner, and OMSNIC opened a "claim file" specifically for the purpose of processing Plaintiff's potential dental malpractice claim to which OMSNIC was the designated insurer.

141.   As of the filing date of this lawsuit, it is not known by Plaintiff, but must be proven by OMSNIC, as part of OMSNIC's policies and practices in the field of dental malpractice insurance claim handling, after the date of opening Plaintiff's claim file, OMSNIC assigned Plaintiff's claim to a designated claim-handling representative for the purpose of conducting a review and determination of facts supporting any potential dental malpractice liability involving Plaintiff's potential claim.

142.   As of the filing date of this lawsuit, it is not known by Plaintiff, but must be proven by OMSNIC, that on a date after July 1, 2015, OMSNIC's claim-handling

representative begun the designated routine of processing Plaintiff's potential dental malpractice claim against Dr. Tiner.

143. As of the filing date of this lawsuit, it is not known by Plaintiff, but must be proven by OMSNIC, that as of December 1, 2015, Plaintiff had or had not yet been contacted by OMSNIC or representative thereto, for the purpose of informing and/or acknowledging to Plaintiff that OMSNIC had received Plaintiff's potential dental malpractice claim against Dr. Tiner.

144. As of the filing date of this lawsuit, it is not known by Plaintiff, but must be proven by OMSNIC, that as of yet an unknown date, OMSNIC, if proven to be Dr. Tiner's dental malpractice insurance company, OMSNIC knew with reasonable certainty of the possibilities of Plaintiff's oral neurological and anatomical injuries becoming permanent within the medically standardized 6 – 12 month period from the date of lingual nerve injuries.

145. As of the filing date of this lawsuit, it is not known by Plaintiff, but must be proven by OMSNIC, that on or about March 1, 2016, Plaintiff was contacted by an attorney, absent proof of representation, who purported to be a representative of Dr. Tiner's Estate concerning Plaintiff's alleged April 17, 2015 dental malpractice claim against Dr. Lonnie W. Tiner, DDS.

146. As of the filing date of this lawsuit, it is not known by Plaintiff, but must be proven by OMSNIC, that OMSNIC was negligent when OMSNIC did not make any effort to contact Plaintiff as *soon as practical*[1] regarding Plaintiff's April 17, 2015 medical/dental injury for the purpose of providing Plaintiff with immediate necessary information that would have aided, and/or prevented Plaintiff from incurring permanent oral neurological and anatomical injury that was alleged to have been caused by the dental malpractice of Lonnie W. Tiner, DDS.

147. As of the filing date of this lawsuit, it is not known by Plaintiff, but must be

[1] California Fair Claim Settlement Practice Regulations, Regs., § 2695.5, subd. (b).

proven by OMSNIC, that OMSNIC knew with reasonable certainty that waiting until a time of March 1, 2016 to contact Plaintiff concerning Plaintiff's April 17, 2015 lingual nerve injury, was a very long time removed from Plaintiff's April 17, 2015 alleged injury and by such time, any possibility of Plaintiff recovering from her injuries by way of surgical intervention was absent and/or lost.

148.    As of the filing date of this lawsuit, it is not known by Plaintiff, but must be proven by OMSNIC, that OMSNIC's omissions of *failing to act* as the actual insurer of Dr. Tiner for purpose of preventing Plaintiff from incurring permanent injury, when OMSNIC knew or should have known that such contact with Plaintiff could have rescued Plaintiff from incurring permanent injury, was negligent as now as of the date of filing of this lawsuit, Plaintiff has suffered permanent life-long bodily injury to which there is no restorative cure or treatment.

149.    If OMSNIC can prove that Dr. Tiner had a valid dental malpractice insurance policy on or about April 17, 2015, then Plaintiff will show that as a direct and proximate result of OMSNIC failure to properly handle Plaintiff's initial claim submitted to OMSNIC on or about July 1, 2015, Plaintiff suffered unnecessary permanent neurological and oral anatomical injury.

150.    If OMSNIC can prove that Dr. Tiner had a valid dental malpractice insurance policy on or about April 17, 2015, then Plaintiff will show that OMSNIC's failure to properly and timely handle Plaintiff's initial claim submitted to OMSNIC on or about July 1, 2015, created a foreseeable risk to Plaintiff in incurring permanent life-long suffering and disability.

151.    If OMSNIC can prove that Dr. Tiner had a valid dental malpractice insurance policy on or about April 17, 2015, then Plaintiff will show that as a direct and proximate result of OMSNIC's failure to properly handle Plaintiff's initial claim and offer to settle submitted to OMSNIC during July 2015, Plaintiff suffered unnecessary permanent neurological and oral anatomical injury to which Plaintiff is entitled to actual damage compensation.

152. If OMSNIC can prove that Dr. Tiner had a valid dental malpractice insurance policy on or about April 17, 2015, then Plaintiff will show that OMSNIC's duty owed as the insurer of Dr. Tiner, were separate and beyond-the-scope of injury incurred by Plaintiff as a direct result of alleged dental malpractice by Lonnie W. Tiner, DDS.

153. If OMSNIC can prove that Dr. Tiner had a valid dental malpractice insurance policy on or about April 17, 2015, then Plaintiff will show that as a direct and proximate result of OMSNIC's negligent omissions of duty owed to Plaintiff, Plaintiff is hereby entitled to recover economic damages that are distinct, separate and unique from those economic damages that might be due to Plaintiff directly as a result of alleged dental malpractice by from Lonnie W. Tiner, DDS.

**SECOND CAUSE OF ACTION**
**PRODUCT LIABILITY BASED ON NEGLIGENCE**
**Defendants: Rainbow Specialty & Health Products Inc.**

154. Plaintiff fully incorporates all preceding paragraphs of this Complaint into this cause of action as fully setout hereto.

155. A cause of action for Product Liability based on Negligence is appropriate when a manufacturer of a product that has been shown to be dangerous or injurious and/or has the potential to cause bodily injury and/or death, negligently places that product into the stream of interstate commerce absent any warnings to such potential affects (*see* California Jury Instructions "1222" – 2016)

156. On or about June 30, 2016 Plaintiff came to learn that Rainbow Specialty & Health Products Inc. ("Rainbow") manufactured and placed the product Dressol-X into the stream of interstate commerce, and promoted the use of Dressol-X for a post-dental extraction condition known as "dry socket".

157. Rainbow manufactured and placed the product Dressol-X into the stream of interstate commerce, and promoted the use of Dressol-X, when Rainbow knew or should have known the product they manufactured as Dressol-X contained 115 mg of ASA, a

known by acceptable scientific and medical standards to be a cytotoxic and neurotoxic chemical agent that can cause damage to mucosal cellular tissue and neuro-cellular structures.

158.   Dressol-X is a topical pharmaceutical product licensed by the FDA under Medical Device NDC # 11004-502-40.

159.   Dressol-X contains Aspirin (Acetyl Salicylic Acid – ASA) 115 mg and Eugenol 80 mg.

160.   Dressol-X has FDA approval for "dental use".

161.   Dressol-X is purported, promoted, sold and distributed for the use in "dry socket" which is a painful dental condition that might develop following a tooth extraction.

162.   It is a generally accepted scientific and medical fact that Aspirin (acetylsalicylic acid – ASA) is a cytotoxic agent that can cause tissue cell destruction and nerve damage.

163.   Dressol-X is a product that is promoted, sold and distributed for the purpose of applying it topically to oral mucosal tissue sites where a freshly removed tooth left a "socket" in the sensitive mucosal tissue.

164.   It is a generally accepted scientific and medical fact that freshly formed tooth post-extraction sockets can sometimes go as deep as into jawbone and adjacent nerve canals.

165.   It is a generally accepted scientific and medical fact that the application of ASA and related chemicals directly to living human cells causes destruction of the cells.

166.   It is a generally accepted scientific and medical fact that the application of ASA and related chemicals directly to living human nerve cells causes destruction of the neurological functionality of the nerve cells (as seen in ototoxicity studies).

167.   Rainbow being a licensed FDA manufacturer of pharmaceutical devices, knew or should have known about the chemical properties of ASA.

168.   Rainbow being a licensed FDA manufacturer of pharmaceutical devices,

knew or should have known about the potential dangers of applying ASA directly to mucosal and neurological cellular tissues and structures.

169.   Rainbow being a licensed FDA manufacturer of pharmaceutical devices, knew or should have known that following some types of dental extractions, there is a risk of damage, exposure or impairment of neurological pathways that run within close proximity to teeth roots.

170.   Rainbow being a licensed FDA manufacturer of pharmaceutical devices, knew or should have known that dental extractions involving lower wisdom teeth have a higher potential for causing injury or impairment to adjacent nerves such as the lingual nerve than any other type of dental extraction.

171.   Rainbow being a licensed FDA manufacturer of pharmaceutical devices, knew or should have known that the product Dressol-X that Rainbow manufactured, should have contained a warning that Dressol-X should not be used in conditions where there might be a possibility of having an adverse cytotoxic effect on mucosal and/or neurological cellular tissue, such as post-lower-wisdom tooth extraction.

172.   There is no evidence available through any of Rainbow's available package inserts and/or reports to the FDA that Rainbow ever considered that such obvious warning should be included along with the manufacture, promotion, sales and distribution of Dressol-X.

173.   As a result of Rainbow's failure to acknowledge generally known scientific and medical fact that should have put Rainbow on notice of Dressol-X's potential dangers, Rainbow's conduct was negligent in the manufacturing, promoting, selling and distribution of its product Dressol-X.

174.   On or about a date prior to April 17, 2015, Dr. Lonnie W. Tiner, DDS purchased Dressol-X from Rainbow.

175.   Rainbow is the only commercial manufacturer of Dressol-X.

176.   On or about June 30, 2016 Plaintiff alleges that she discovered that she suffered permanent anatomical and neurological injury as a result of Dr. Tiner purchasing

Dressol-X and subsequently applying numerous Dressol-X gauze pads inside of Plaintiff's freshly formed, deep and painful right-lower wisdom tooth socket.

177. On or about June 30, 2016 Plaintiff discovered through research that prior to April 2015, Dr. Tiner had employed a product called Dressol-X that he purchased from Rainbow to use in his oral surgery office.

178. On or about June 30, 2016 Plaintiff discovered documents that indicate Dressol-X contained a cytotoxic drug that when applied directly upon nerve tissue can destroy nerve tissue.

179. On or about June 30, 2016 Plaintiff discovered documents that indicted that because of potential risk of neurological and mucous membrane injury, no reasonably knowledgeable oral surgeon would employ the use of Dressol-X in a freshly formed lower wisdom tooth socket.

180. As Plaintiff has properly pleaded throughout this Complaint, following Dr. Lonnie W. Tiner's April 17, 2015 extraction of Plaintiff's right-lower wisdom tooth, it was necessary for Plaintiff to re-visit Dr. Tiner's office on no less than five occasions for the treatment of severe pain and suffering, whereby Dr. Tiner packed Plaintiff's freshly formed right lower wisdom tooth socket with what Plaintiff came to learn, on or about June 30, 2016 was the product Dressol-X.

181. On all five of Plaintiff's visits to Dr. Tiner for treatment of painful wisdom tooth socket, Dr. Tiner either by ignorance, lack of knowledge or negligence, knew or should have known that the local administration of Dressol-X could cause severe lingual nerve damage to Plaintiff's right-lower lingual nerve, but administered Dressol- X to Plaintiff regardless.

182. As a direct and proximate result of Rainbow allowing Dressol-X to enter the stream of interstate commerce thus reaching Plaintiff's oral surgeon Dr. Tiner absent any warnings to the affect of Dressol-X's potential for injury if used in post-lower wisdom tooth extractions, Plaintiff suffered permanent, life-long anatomical and neurological injury that was exacerbated by the cytotoxic effect of ASA that came into

direct contact with Plaintiff's right-lower lingual nerve fibers that control sensations to the tongue, that were exposed at the freshly formed post-tooth extraction socket to which Plaintiff is entitled compensation according to proof at trial.

183.  As a direct and proximate result of Rainbow allowing Dressol-X to enter the stream of interstate commerce thus reaching Plaintiff's oral surgeon Dr. Tiner absent any warnings to the affect of Dressol-X's potential for injury if used in post-lower wisdom tooth extractions, Plaintiff suffered permanent, life-long anatomical and neurological injury that was exacerbated by the cytotoxic effect of ASA that came into direct contact with Plaintiff's buccal nerve fibers that control essential oral functionality, that were exposed at the freshly form post-tooth extraction socket to which Plaintiff is entitled compensation according to proof at trial.

184.  As a direct and proximate result of Rainbow allowing Dressol-X to enter the stream of interstate commerce thus reaching Plaintiff's oral surgeon Dr. Tiner absent any warnings to the affect of Dressol-X's potential for injury if used in post-lower wisdom tooth extractions, Plaintiff suffered permanent, life-long anatomical and neurological injury that is characterized by numbness, lost of taste to the right-side of tongue as well as cheek-tongue biting syndrome and choking on liquids, caused by and the cytotoxic effect of ASA that came into direct contact with Plaintiff's lingual and buccal nerve fibers, that were exposed at the freshly form post-tooth extraction socket to which Plaintiff is entitled compensation according to proof at trial.

## PRAYER FOR RELIEF

1) Compensation of $250,000 (limited by statute) - from Lonnie W. Tiner, DDS for dental malpractice concerning Dr. Tiner's negligent use of Dressol-X,

2) Expenses of $50,000 – from all Defendants,

3) Incidental future medical and living expenses necessary for pain, suffering and inconvenience in the amount of $175,000 – from all Defendants,

4) Compensation of $2,000,000 - OMSNIC for negligently allowing Dr. Tiner

to practice oral surgery with an OMSNIC approved dental malpractice insurance policy that resulted in Dr. Tiner permanently injuring Plaintiff whereby there was no justification or excuse for OMSNIC's negligent conduct.

5) Compensation of $2,000,000 - from OMSNIC for negligently handling Plaintiff's insurance claim thus causing Plaintiff's alleged injuries to become permanent and non-correctable,

6) Compensation of $2,000,000 – from Rainbow for negligently manufacturing, promoting, selling and distributing Dressol-X that significantly contributed to Plaintiff's injury, absent any warnings that Dressol-X should either be used with caution or not at all in the treatment of dry socket associated with lower wisdom tooth extractions.

**VERIFICATION**

Craya C. Caron, am the Plaintiff in the above-entitled Complaint. I have read the foregoing Complaint and know the contents thereof. The same is true of my own knowledge, except as to those matters that are therein alleged on information and belief, and as to those matters, I believe it to be true. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: June 20, 2018

Craya C. Caron - Plaintiff

This envelope is made from post-consumer waste. Please recycle - again.

PRIORITY

UNITED STATES POSTAL SERVICE.

Retail

P

US POSTAGE PAID
$6.70

Origin: 92277
Destination: 92501
0 Lb 13.60 Oz
Jun 20, 18
0579980277-10

1006

PRIORITY MAIL 1-Day ®

Expected Delivery Day: 06/21/2018

C002

USPS TRACKING NUMBER

9505 5148 8463 8171 1240 73

FROM: Craya Caron
1125 Jackrabbit Trl
Twentynine Palms, CA 92277

TO:
US District Court
Attn: Court filing clerk
3470 12th St Rm 134
Riverside, CA 92501

RECEIVED
CLERK, U.S. DISTRICT COURT
JUN 21 2018
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION BY DEPUTY

PS00001000014

EP14F July 2013
OD: 12.5 x 9.5

VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

UNITED STATES POSTAL SERVICE®